Appellant James Badger. I'm requesting five minutes of rebuttal time. That's acceptable to the court. Let me ask this. If you were to win, obviously I'm not saying you would win, but unlike most habeas cases where you're asked if the remedy is a new trial, the problem here in the room, to the extent that it is a problem, was after trial. Correct. What would be the remedy? And if you got it, how would that help you? Well, I believe that the remedy would have to go back to the point where the conflicted attorney, Ms. Lawhon, came into representation of Mr. Badger. That would be when she came in and represented him on his direct appeal. So you want a new hearing on the remand? Go back to when she took the direct appeal and remanded back for a hearing on the Brady claim. You want a new Brady claim hearing? Certainly that's the point where we can trace back the actual conflict, where the conflict she had affected her performance. What was the conflict? The conflict that she had was... I understand that she at one point had represented his sister. Right. What's the conflict? The allegation that was made as the basis for the new trial motion was that the primary witness against Mr. Badger was Frank Johnson. She had represented Frank Johnson's wife. The allegation was that the state had offered Mr. Johnson a plea bargain that if he cooperated against Badger, his wife would be released, not charged with the murder, which she was at that time under indictment for the murder. This particular aspect of the agreement with Frank Johnson was not disclosed to Mr. Badger at the time of trial. You're saying it was not disclosed, but what evidence do you have that it even existed other than the allegation? Well, Mr. Johnson certainly testified that one of the reasons that he cooperated with the state was in order to obtain the release of his wife. That was found to be, to put it mildly, not credible. Exactly, exactly. Nevertheless, we have his statement, which was found not to be credible, combined with Ms. Lawhon's statement in her letter that said, based on what the prosecutor testified to regarding Pat's release from jail, I was as surprised as you were. If you'd rather have me as a witness, let me know. At the evidentiary hearing, what was the explanation, if any, for that particular statement by the attorney? There never has been an evidentiary hearing with regard to what Ms. Lawhon meant when she wrote that letter. The evidentiary hearing that was held was on the motion for a new trial, for the Brady hearing, really. And at that hearing, Ms. Lawhon was the one who was cross-examining the prosecutor who had made the deal with the witness who testified and her client, the wife. She knew something that had happened there that made her more appropriate as a witness than as an attorney. The letter is dated November 30th, I guess, of 94. 94, correct. After he gets this letter, he continues with that representation until, I guess, sometime in 96. So why, if you had an argument against a conflict of interest, once she disclosed the problem, why isn't he waiving the conflict by not basically discharging her? She was retained or appointed? That's unclear, actually. If she was retained, who she was retained by, the state's taken the position she was retained. I've never seen anything in the files that indicate that. It's unclear to me how she came on board. If someone else retained her, it's simply not in the record. She writes the letter November 30th of 94. Right. In October 10 of 97, the new attorney files, almost three years later, there's a new attorney that files the PCR petition. Again, why isn't the conflict of interest, assuming it can be waived and that's a big if, why hasn't it been waived? Well, because you can't ever have a waiver of a constitutional right simply by inaction. And what the record here shows is nothing more than inaction. There's no letter that says, you know, I think you're a great attorney, please stay with me anyway. None of that. She writes him this letter, maybe I'm a better witness, and then we have silence. But it balls in his court. I want to go back to the conflict question. She said, at one time I represented your sister. Right. And the possible testimony that we're speculating that she could give is that Ms. Laughlin might have known that Mr. Johnson, Badger's sister's husband, Right. Claimed, turns out erroneously, to have a deal with the prosecutors not to prosecute Badger's sister, Johnson's husband. But if there's a, that's a conflict possibly that, I don't know, doesn't that relate to Ms. Johnson? It doesn't relate to Mr. Badger. Ms. Laughlin's position as a witness could come about in many different ways. Possibly she had a conversation with Mr. Luther directly. Wait, who's Luther? Luther is the prosecutor. But what does that have, all of this have to do with the conviction of Badger? In other words, what did she know that would put her in a situation where her knowledge harms Badger on appeal? She was appellate counsel, right? Correct. She can't, she was appellate counsel but she was also counsel on the new trial slash Brady motion. She can't call her former client to testify. But she could call Frank Johnson to testify. Frank Johnson did testify. Yes. But the judge didn't believe him. Possibly Mrs. Johnson, Badger's sister, could have been called to testify to something that we don't know about because she couldn't call her. You want to corroborate Frank Johnson, you want to hear, you want somebody to corroborate Frank Johnson. Frank Johnson needs a lot of corroboration. Yeah, he needs a lot of corroboration. Yes, so maybe, I mean she's saying she might be a witness. Maybe she had direct conversations with the prosecutor, Mr. Luther, who would have said, well you know if Frank Johnson cooperates your client's out of jail. That would be a significant piece of information. Maybe she would be a better witness to say that and directly talk to the prosecutor. But we have to get beyond here a significant piece of information if all of those things happened to whether it is a prejudicial piece of information. Well, I think. In other words, was Mr. Badger in effect denied his Sixth Amendment right to counsel? He was in a situation in that Brady new trial hearing where the person who was representing him came out of it as an attorney believing that she would have been better, that he would be better served with her as a witness and not as his attorney. She said, well I think what she said in her letter said, you may want me as a witness rather than representing you. In light of Mr. Luther's testimony concerning Pat's release from jail, you may prefer to have me as a potential witness rather than as an attorney. So she's clearly focusing this on what. I was not surprised by the testimony as you were. Yes, and she's clearly focusing it right on the prosecutor's testimony regarding Pat's release from jail, which is at appendix 2, page 88. The letter's at 81, his testimony's at 88. So what happened was when Johnson testified, she was surprised by that testimony as well. I think she was. I read the letter saying she was surprised by the prosecutor's testimony. Mr. Luther, when he said Pat's getting out of jail, you know, was not a part of the deal with Frank. She was surprised by the prosecutor's testimony. And let's assume you're correct. How does that affect adversely the assistance given by Ms. Loughran to Mr. Badger? Well, there are two things right off the bat she can't do. She can't call Pat Badger, former client, can't get on the witness stand herself and testify because she's counsel. But if she thought that that were an issue at the time, she could probably have brought it up to the judge saying, wait a minute, Judge, I just want to let you know that I previously represented his sister, and I'm surprised by what the prosecutor just said. But, you know, what are the issues? There are a lot of things that could have happened here that didn't, and clearly that's one of them. I mean, that's what certainly I would hope I would do under those circumstances. And certainly in Mr. Savas' brief on the post-conviction proceedings, he pointed out that having a prior representation in a case such as this could very well be a violation of the rules of professional conduct that were in force in New Jersey at that point. Should she have done that? Probably. These are all the things we don't know because there was never a hearing. These facts have never been developed. We just have this incredibly tantalizing trailer of this letter to say there's something going on here that I really might not be appropriate as your advocate. I'm a better witness for you. I know something that contradicts the prosecutor's testimony that's right at the core of your Brady motion, and I can't tell it. And that's an adverse impact. Well, I think that, Ms. Gibbons, you've said it all. It's a tantalizing trailer, but the standard is actual conflict. And I think that that's what you have to look at. Actual conflict, though, is another representation that affects the attorney's performance in the new representation. Certainly this letter indicates that her performance is affected. You might prefer to have me as a witness because there's something I can't do as a lawyer. She doesn't say that. She says that you may prefer to have me as a witness, but she doesn't say that she can't perform as a lawyer. In a perfect world, that would be there, too. However, she's certainly saying I'm a better witness than a lawyer. You may prefer. However, she's in the position where she's thinking I'm a better witness. She should have done something else, as Judge Ambrose points out, told the judge, created a record with her client, gotten a written waiver. I mean, I could go on. There are a lot of things she could have done and didn't. You were telling Judge Ambrose that there were two things. One was that she could have called Pat Badger as a witness. What was the second thing? She could have testified herself. She might have said I had a conversation with Bob Luther where he told me, hey, if Frank cooperates, your client's out of jail. And that would have been a very significant piece of evidence. But come back to the facts of the case. Johnson testified that he, along with Badger, entered Tobago's house. He testified that he was there first and that Badger came in subsequent. So in that context, it makes every bit of sense not to indict Johnson's wife. It's really Johnson and Badger who were involved when the murder took place. Actually, Frank and Pat Johnson lived with Mr. Tobago as sort of housekeeper attendants because he was elderly and had some health problems. So Pat Johnson was certainly involved with the Tobago home, with who got in there, who was there. But she wasn't involved with the murder, and there's no evidence that we know of that she was involved in a conspiracy to rob the person and to injure him. Well, certainly the prosecutor felt that there was enough evidence to have her indicted and convince a grand jury, but since he dismissed it before him. But there's also a good reason the prosecutor should let go of the indictment when he finds out that she doesn't have much to do with it. Well, although in the space of two months, I believe it is, yes, starting in February of 91, Frank Johnson denies any involvement in anything. In June of 91, he says he was solely responsible for this, and there was discussion that Mr. Tobago had made some insulting comments about Pat Badger. So now Frank Johnson is totally responsible. No one else is involved. In August of 91, he gives a third statement and implicates Mr. Badger. So he's got three diametrically opposed. He's in jail the entire time. He's in jail all that time, and so is his wife. And then finally in August of 91, he implicates Badger, and Pat gets out. He gets charged with aggravated manslaughter, and he gets several other benefits as well in terms of a reduction in sentence that was over a year out of time. He gets several other benefits that are going on here. These statements are all in the appendix. The information on the record, I remember I read this somewhere. I'm not sure who said this. The fact that the proffer with Frank Badger and the DA was in the DA's office, in the assistant DA's office, prosecutor's office, by himself, without Frank Johnson's attorney being there. Where did that come from? Is that something that the DA testified to on remand? Is that something Frank Johnson testified to? I believe actually that Johnson's attorney testified, Mr. Lesnik. I'm sorry, I may be butchering his name. I believe he testified that Johnson was already in there when he came in. He came in at some point, but there had been a run-up to this where the prosecutor, the investigator from the state police, and Johnson were there. When he got there, then they went on the record. So he wasn't there the full time. And certain of these other conversations occurred without his presence, I believe. Did we miss any questions? No. We deserve quite a bit of time for rebuttals, so we'll hear back from you. Thank you very much, Sean. May it please the court. The first thing I would like to say, and give your name for the record. Is that better? Okay. Like that? Can you hear me now? Yeah. And your name is? Oh, I'm sorry. My name is Deborah Bartolome, Deputy Attorney General, and I'm on behalf of Appellees. Okay. And I just would like to point out one thing, that I think when we talk about a conflict here with the appellate attorney, it's a bit of a red herring. The fact that his appellate attorney also represented his sister doesn't really incapacitate her anymore from testifying about her previous client than if she had had a different attorney because that client has confidential communication. What if, for example, Ms. Laughlin was essentially trying to overturn the conviction by arguing that her former client, the defendant's sister, got a sweet deal that she didn't deserve when her husband starts saying, Okay, look, it wasn't my wife. I was there, but it really wasn't me. It was Badger. And she knows that the wife got a great deal, and she may know a little more about what the wife did. We don't know exactly what she knew. It doesn't look good. And Laughlin says the right thing in her letter. You know, you may want me as a witness. You may not want me representing you. There's plenty of people out there to represent you. But there's only one me as a witness. Well, Your Honor, everyone knew what happened before trial as far as Pat and Anthony Burton also being dismissed. They knew about the dismissal. That's correct. And they probably knew that Johnson was. . . What Brady information was not turned over, purportedly not turned over? This was in it. . . What happened here was that. . . And this was a big part of Frank Johnson's cross-examination. You'll see all of these allegations were out there. They were raised in the direct appeal. Now, law had on direct appeal when she was Badger's defense attorney. She had gotten Frank Johnson to write a letter from jail or some kind of affidavit recanting his entire trial testimony. We also had in the record letters from Frank Johnson to the prosecutor saying, Oh, no, now I'm in New Jersey State Prison with Badger. He was scared to death of him. Can you protect me? So what the prosecutor tried to do was get Frank Johnson moved out of New Jersey State Prison where Badger was, harassing him and scaring him on a daily basis. These are all in our appendixes on the records in our exhibit. But what's the Brady information? Well, what happened is that the prosecutor tried to get him transferred, but the prison system will not allow someone who has a 20-year sentence, which was Frank Johnson's original sentence, to be anywhere but New Jersey State Prison, which is where Badger had to be as a murderer. How many state prisons are there in New Jersey? There are quite a few, but when you have a sentence of 20 years or over, you go to New Jersey State Prison, or you did back then under the Department of Corrections policy. So what happened was that... When you say New Jersey State Prison, that's an institution? Name? Oh, yes, Your Honor, I'm sorry. That's the one in Trenton. What about Rahway? I know there are murderers in Rahway who are doing life, many, many times doing life. Well, this is what came out at the hearing and in the information that I had before then, leading up to the indirect appeal. They remanded for a hearing. None of this was on the record. All we had were these frantic letters from Frank Johnson, and Luther agreed with Frank Johnson's attorney that he would not object to a late motion for resentencing, which was out of time. The prosecutor wouldn't object. This was all after the trial. But you're saying that he agreed to a motion to resentence, to go from a 30-year sentence of incarceration with 20 years of no parole down to 10 years with 7 years of no parole to get him into a different institution? I'm not sure it was 50 to 20. I think it was 20-10, and it went down to 7. So it was a very significant reduction. It was a substantial cut after the fact. And the purpose of that was to get him to a different institution? Well, to get him away from Badger and also... To get him to a different institution? Yes. Yes. You know this terrain much, much better than I, but what you're saying is better than me, but it surprises me. You're saying that if someone draws a 30-year sentence, I assume with a certain 20-year ineligibility for parole, there's only one institution in the state of Pennsylvania that can house that person? New Jersey. In New Jersey, I'm sorry. This was back in 94, 93, whenever this happened. Back then, there was only one place that would house this guy? If your sentence was 20 years, it wasn't a 50 with a 20 on it. That's the question. Because... If the sentence is 20 years, there's only one place that would house the person? At that time, they wouldn't move him with a 20-year sentence. That's what I understood from Bob Louie. Because, again, I know people doing life in the wrong way. That's why I'm having trouble with this. It may be changed now. But he had only pledged... But this was back in 93, 1991, 1992 when I was there. There were people in there, a lot of guys doing life, and everyone looked like they should be doing life. But they were doing substantial sentences in the wrong way. Well, Bob Luther told me he had tried to get him moved, and the prison refused to move him because of the length of his sentence. Is that the Brady information? Well, the Brady claim where Frank Johnson recanted again and said, I made all this up, an innocent man. No, Frank Johnson had only pledged to robbery. What happened was the four of them were all indicted for everything. But before the trial, when Frank Johnson took a lie detector test, and we believed him that the participation of his wife, Badger's sister, and Anthony Burton were basically information ahead of time, in on the plan, Johnson was in on the robbery, but the worst actor was Badger. And not only did we know that from the fact that Frank Johnson passed the polygraph, but Badger has done the same thing before, almost to the letter. So it wasn't as if... He robbed people before. Well, he actually killed a man and robbed an elderly man when he was 17, and that's in a case in rape JPB. And he was let out of prison for that. Then he attacked another man. So this is a small community, and basically... And Johnson's pretty clean. This was his first encounter with the law? I don't think it was, but he wasn't a violent criminal. And he and Badger's sister worked for Mr. Tobago. They weren't really housekeepers, or they lived in the trailer, but they had moved out and they had told Badger this would be a good time to rob. So they were definitely in on the robbery conspiracy. But there wasn't a plan for murder. If you read the facts in the state's brief or look at the transcripts, you'll see that what happened was... Do you think I hit this off? I'm not sure. The matter is clearly under the law, there's enough to charge all four of them with conspiracy. And I don't know the law of New Jersey, but in Pennsylvania, that would certainly get you a felony murder. And I'm assuming that in New Jersey, the laws are such that all four of these folks could be charged with murder, not having first degree. You're talking some lesser degree of offense. So Badger is arguing that in order to get Frank Johnson to testify that he, Badger, is the killer, a deal was cut to let Frank Johnson's wife walk. Not only walk, but get her out of custody. And he can't prove that because his attorney was conflicted and represents Pat Badger. But for that representation at the remand hearing, he could have shown a Brady violation, the Brady violation being this deal between Frank Johnson and the government to let Patricia Badger out of jail if Frank gives them Badger. But, Your Honor, at the trial itself, this was an extensive topic in the cross-examination of Frank Johnson. Well, what difference does it make? Johnson, of course, denies it. Badger is saying he wanted to be in a position where he could call Pat Johnson and say, well, wait a minute, that's my understanding of the deal? Or I guess his attorney, even at that point, well, she didn't represent him at that point during the trial. But he is saying that had he known all of this, that his attorney could have represented that there wasn't, her understanding was there was a deal between Frank Johnson and the government to give the government Badger, and the deal was that if he testified against Badger, Pat Johnson walks. That was the deal with Frank Johnson, for him to plead to robbery and get the first sentence, that was all on the record? Well, that's what you're saying, that's what Johnson is saying, but you're asking us to trust you. Badger is saying that wasn't the whole deal. The deal was, in addition to pleading to a lesser charge, that if he testified against Badger, the charges against Pat Johnson would be dismissed. And there's enough circumstantial clout around this to raise some real problems. The fact that a prosecutor would take a proffer, someone like Frank Johnson, in his office without Johnson's attorney being present, I tell you, I read that, I almost fell off my chair. Why would any prosecutor do that, unless maybe there's some kind of a side deal going on? They had a remand on this, and we had the judge that did the resentencing, we had the prosecutor testify, and Frank Johnson's attorney. Well, the prosecutor said something that really shocked Badger's attorney. She says in her letter, I was surprised in light of Mr. Luther's testimony concerning Pat's release from jail, he might want to have somebody else. I was as surprised by his testimony as you were. That's very interesting, Your Honor. Now, all of a sudden, this letter, which was three years before the post-conviction hearing, was there sent to him, and yet at the post-conviction hearing, we hear nothing about this. That's the problem. Isn't that the problem? That she was in a conflict and didn't say, Wait a minute, Judge. I'm surprised by Mr. Luther's denial of an agreement, is what he said in the letter, because my information is there was an agreement between Mr. Luther and my client, or Mr. Luther and Frank Johnson, for Johnson to testify in a certain way in order for Pat to walk. This is very inconvenient for the defendant, because we can't cross-examine this. It's taken as truth on this point. But you're saying this is convenient for the defendant. I'm relying not upon what the defendant said. I'm relying upon what the defendant's lawyer said. I was as surprised by Mr. Luther's denial of an agreement about Patricia as you were. That's the attorney speaking. That's not Badger speaking. But she doesn't even put this in a certification. This is a letter to her client. But isn't that the problem? That's exactly it. We're not communicating here. The problem is there's this allegation that there's a relation to this, some deal going on between Luther and Johnson that Badger's post-conviction attorney knows about. She didn't represent him at trial. Badger is saying, but for this conflict, at that V-man hearing, he was in a position to produce evidence of an agreement between Luther and Johnson that he couldn't produce because the attorney was there as an attorney, not as a fact witness. Well, the attorney could never be a fact witness against her own client, Pat. Exactly. That's why there's a conflict. But the point is, any appellate attorney would not be able to get Pat's attorney on the stand to talk about this. So the fact that she wrote this very vague letter saying, I was surprised, it seems to me kind of carefully caged, and when you look at it, you could have the public defender's office handle the appeal. Well, to me, that's a very clear indication that this is retained counsel, and yet the petitioner is denying it. What do you mean? What do you mean it's retained counsel or appointed counsel? Are you saying the Sixth Amendment doesn't apply if you were appointed counsel? Absolutely not. What I'm saying is that this impacts on the credibility of a lot of statements Mr. Badger has been making. He keeps saying, I had appointed counsel or assigned counsel, and he didn't. He retained Linda Lawhan. Help me understand why that makes a difference. In the context of this habeas appeal, why does it matter whether or not Badger had retained counsel, whether he thinks it's retained counsel? For all we know, and I'm sure you've seen this happen many times, the family goes out, raises money, and hires somebody, and the defendant is totally removed from that, and may or may not know the nature of the relationship in terms of who's paying the attorney, how much. Why does it matter? What's at issue here is whether or not there's a legitimate Brady claim that nobody can get to because of the intricacies of AEDPA and the kind of weird circumstances we have here with Ms. Lawhan's representation. Well, because it reflects on the credibility and what's going on here. What Badger does is, he doesn't bother bringing this up in state post-conviction where we would be able to put people on the stand and cross-examine them. No. He waits for the appeal, and then he makes a claim, and all of his claims seem to, you know, he had a full hearing on all these Brady cases. Well, if your concern is that you wanted to put people on the stand and cross-examine them, we can fix that. That's easy. That's not a problem. It isn't quite fair to us at this point, Your Honor, because, you know, we're handicapped. These are events 15 years ago, and if we go into state court now, we don't even know what Frank Johnson will say at this point. Well, no one ever knows what Frank Johnson's going to say. It depends on the fullness of the movement, Frank Johnson says. But Frank Johnson is your guy. He's the guy who basically convicted Badger. But for Frank Johnson's testimony, there's nothing to say that Badger's the killer. There's a footprint that you tie to somebody else. I would have to disagree with that, Your Honor. Maybe I misread the record, but there's evidence that there are four people involved. The evidence that says that of those four, Badger's the killer comes from your friend and my friend, someone we've all known to come and love based on these hearings, Mr. Frank Johnson, who no one seems to be able to believe unless he's saying something that the person hearing it wants him to say. Which the jury heard all about, and yet they believed him. What was the other evidence of culpability of Badger? Well, for one thing, everyone in town, all of his friends he made statements to about it. He bragged about it. He had the victim's items, and they were items that were pretty unique, you know, a watch, a bank, a telescope that he was trying to sell, selling, and his friends. It seems like all four of them were in there. The issue is who killed the decedent. And the question from Judge Imbro is what evidence do you have other than Frank Johnson to establish that it was Badger, and not Frank Johnson, not Patricia Badger, that the fourth person who was in there was Badger who killed the decedent? Other than Frank Johnson's testimony. He had a fair trial with cross-examination. Answer the question. Was there blood stains on him? What else besides Frank Johnson's testimony showed that Badger was the murderer? Were there other witnesses? In the house? Were there other witnesses at the trial who established that Badger was the guilty party? There were other witnesses. You indicated that there were persons to whom Mr. Badger was bragging. Did they testify during the course of the trial? Yes, they did, Your Honor. He said things like, we got the money, and you could have had some of this, and things like that. He never said, I was the one who picked up the rock. No, he didn't do that. What was the other evidence then? Well, all of the evidence that puts him. Let me start off. I really want to get this. What was his defense, and what was the evidence against him other than Frank Johnson's testimony? Let's start off with what was his defense? That Frank Johnson did it. And then what was the evidence against him that pointed to him rather than Frank Johnson? The fact that he had the victim's things, that he spent the victim's money. The fact that he was very interested in going to the police, making statements. He had a lot of his own statements, consciousness of guilt type of things. Wait, Badger was interested in going to the police and making statements? Well, the police first, when they started questioning people, when they picked up Pat Johnson and Frank Johnson, he ran up to the police and he kept saying, well, what are you talking to them for? What are you saying? He got upset. When he was first accused by his former girlfriend, he beat her up, and he pretended that she had pulled a knife on him, ran and made a, he was doing a lot of things that betrayed consciousness of guilt. He tried to arrange with a police officer that he had been speaking to him on the night of the crime. He was seen in his car leaving the scene of the crime. He was seen before the crime. So, again, we all agree that these four folks, maybe you wouldn't agree, but I assume the evidence is that these four people, including Badger, were involved in the killing. And that two people, Badger and Johnson, were at the scene. Were at the scene, yes. So then it becomes, it really becomes one person's word against another, right? Badger says Johnson does it. Johnson goes into court and says Badger did it. Right, and the jury calls that one. And the defense at that point, I think as I understand it, had not been told that there was some type of deal with Johnson to shorten his sentence. Is that correct? Or at least there was an allegation that was remanded. There was no such deal. The sentence resentencing came about later. There was this allegation and there was a remand on that issue. An extensive remand with testimony, cross-examination, judges finding, and appeal from the remand. And the judge said that he didn't believe Johnson's testimony, that he got a secret deal? He said, I believe, that it was nauseating how much he was lying. And he actually played to perjury for saying those things after that. Well, that's in a couple of ways. If Johnson is that unreliable, he's the only guy who is saying that it's bad. It's this kind of thing. A is saying B did it, B is saying A did it. You get to A, at least Badger's allegation is, the reason that Johnson is in here, the reason I'm in here and not Johnson is because they cut the deal with Johnson and not me. If they cut the deal with me, I could have gotten Johnson convicted. That's what he's arguing. But for the fact that he didn't know because of his attorney's representation on post-conviction that he didn't have the availability of evidence, the ability to cross-examine Luther, to establish what he's alleging about this deal between Mr. Luther and Pat Johnson, or Pat Badger, but for that he could establish a remand that there was this Brady material that wasn't disclosed. That is, the deal between Johnson and the DA's office. That's what the allegation is, obviously, and that's what someone ought to be able to take a look at that. No, Your Honor. At best, what we're talking about is some kind of hearsay where Pat would somehow have heard about the deal with Johnson when they already had the remand with Johnson himself. Well, think about what you're saying. This is not just somebody. This is Ms. Johnson's attorney who may be in a position to say that Mr. Luther's testimony at the remand hearing surprised her. It surprised her because it was her understanding that there was a deal for her client to be released. In fact, she may have cut the deal. She has, from what I've seen in the record, there is something from the attorney that raised this on appeal that claims that he did ask her about this and that she said she doesn't remember any of this. Well, we can fix all this, essentially, by getting to, you may be absolutely right, you may be totally right, this might be all a manifestation of Mr. Badger's very fertile imagination. Clearly, it's being driven by self-interest. He got a very heavy hit. But it doesn't seem to me that the interests of justice are better served by somehow getting this into a forum where Mr. Luther can be put under testimony, specifically asked about it, that Ms. Lohan can be put under testimony, and specifically asked about it, to have some kind of a hearing, if for nothing else than just to promote the dignity of the whole judicial system. Mr. Luther was already a witness on this. I know he was. He's the one the judge believed. The judge believed Mr. Luther, believed Johnson's defense attorney, and believed the judge at the re-sentencing. I understand that. What was the cross-examination of Johnson at trial? It was basically that he did it and was trying to save himself and lying to save his wife and pinning it on Badger. That was most of it. So it boils down to credibility. He's had this opportunity. The jury was convinced that he was guilty beyond a reasonable doubt, so this just is not a basis for him. Let's assume, hypothetically, humor me on this. I know we disagree on it, but humor me. What if the jury had heard, after Johnson got done testifying, that there was a deal between Mr. Luther, or whoever was the DA at the time, and Frank Johnson, that if he testified in a way that was favorable to the government and basically said that it was Badger that did the killing, that Pat Johnson would be released and there was a good chance that he, Mr. Johnson, could get a reduction on his sentence? What if the jury heard that? Do you think that a reasonable jury could think, well, if it was Mr. Johnson, I wouldn't buy his car for him anyhow, and now that I've heard this, I've got a reasonable doubt here. Well, there was a plea deal. It just wasn't exactly what Badger is saying now. The plea deal was that Frank Johnson had to tell the truth, and the jury did hear that. Now, they can believe he's lying or not. They made the call. You'd answer the question as I asked it. Had they heard about an agreement that he'd get a reduction of sentence, not from the sentence that was given, that was clearly a reduction of a murder sentence, but later on the government would not object to a substantial reduction over the sentence that was initially pled to, and that his wife would be released from custody, charges would be dropped, if he testified against Badger and said Badger did the killing. Would that have an impact on the fact, Frank, did you think? It's pretty much what they did hear argument about, and as far as the part about the resentencing happening before the trial, before he testified, none of that is even true. He got a plea deal. It happened quite a bit afterwards. It happened at request. Sometimes they have to try to understand that. But what you're saying is the arguments that Judge McKee is making were in fact made to the jury at the time, and the jury didn't buy it. Right, with a slight difference that I don't know. There was, we disproved the Brady claim, and there was nothing at the trial about a secret deal because there was no secret deal, which has been proved. The only deal was to nullify the prosecution against the wife, right? Those charges were dismissed because Frank Johnson actually passed the polygraph, and the prosecutor made the decision we didn't have enough on them. You saw Anthony Burton had some stuff. That came out in the trial. He had, I think he was trying to sell the telescope. Pat was implicated because she and her husband lived with him, and Frank Johnson, or somebody even admitted that Badger was told by them that Mr. Tobago would be alone that night and that he had recently come into a lot of money. So Burton had the telescope? At the fair. I witnessed testified that he had been trying to sell that, yes. Thank you very much. Thank you. Thank you. If I may just briefly address a couple of the factual issues here. The court asked counsel about the resentencing of Frank Johnson, and I believe counsel's response was that he had fears at the state prison because he was there with Badger, and that his letters reflected that fear. His recantation letter was dated September 93, and this is in the appendix. His resentencing occurred in December of 92. So his resentencing occurred significantly before he's writing the recantation letter. So whether he's believed or not on recantation, there's other things going on here besides I'm afraid. Is Johnson still in prison? I actually don't know the answer to that. I would expect not on this since so much time has passed, but I don't know his whereabouts now. The evidence against Mr. Badger as the killer. There was no physical evidence, no forensic evidence that linked him. There was a shoe print at the back window of the trailer where Tobago lived. That shoe print was not a match with shoes that were examined from Badger. That was the theory that Badger had come in the back window. Johnson distracted him in the front, but the shoe print didn't match, so that was kind of a wash. The witness who saw a car coming away from the trailer was ambiguous initially about the car, the color, the make, didn't identify Badger in the car, and then later on came up with the color after she had been hypnotized, which raises a whole host of other issues. So there was no direct physical evidence that Badger had been the killer in this case. Was he a bad guy earlier when he was a juvenile? Well, maybe, maybe not, but that's certainly not evidence here. Were there other witnesses that implicated him? There were witnesses. There were a lot of witnesses who said that various people had things that were taken from Mr. Tobago's trailer. Mr. Tobago seemed to have had a number of odd pieces of jewelry, a telescope, memorabilia, different things his wife had. And people showed up with his stuff later on, and everyone was saying, you know, Anthony Burton's got the telescope, Badger was wearing a watch that looked sort of like that, had a black face on the watch. Was it the same? Who knows? It seems that Mr. Tobago's things were circulating around through a lot of people in this community. That doesn't make him the killer. That makes him someone who had things. Does it link him up with the group who did it? Absolutely. But there seemed to have been a lot of people who were linked up with that group, including Pat Badger, who walks on this charge because she has things, too. Mr. Bartomi's argument is that the jury heard all that. The very argument you're making now, I'm assuming, was arguing to the jury, look, they've all got stuff. And even if Badger was somehow involved, the only person who says that he's the killer is Frank Johnson. You've got just as much reason to believe that Badger was the killer as that Frank Johnson was the killer. I'm assuming that argument was made to the jury. But the reason that we have Brady is because it's very different for a defendant to say, hey, this witness against me has a lot of motive to lie. He's going to get, you know, look, his wife got out. It's another thing to say the state made a deal with you where we agreed that if you said this against Badger, we'll let your wife out. That's a very different thing from defense speculation that, oh, you were hoping to get a deal. No. If the state comes out and says this was our deal, testify against Badger, pat walks. That's very different for a jury to hear that the state did that, that the witness knew when he testified that he was going to obtain this benefit. Very different because it has all the credibility that the state carries with it and none of the self-interest that the defense is burdened with. If there was a deal cut to let out Badger's sister and Lon was involved with that, why would she even – I'm not sure why she would have taken the representation to begin with. She now says she doesn't – I mean, she doesn't really recollect a whole lot. Is that right? She's now a prosecutor in the same office as Mr. Luther. I mean, she's got more conflicts than I can – But the point is even if we were to remand, it sounds like we wouldn't get much. You know, she's never been put under oath. Well, she's never been put under oath. When this case was remanded previously for the Brady hearing, there was lots of testimony, lots of cross-examination, and lots of questions as to whether or not there were deals. That's right. And it all came back negative. Never of her. Frank Johnson, who doesn't have all the credibility in the world, said there was a deal. The prosecutor, Mr. Luther, said there couldn't be. He had enough credibility to convict somebody of murder. Well, he certainly did. And in fact, the appellate division chastised him a bit for his intemperate language regarding Mr. Johnson. But Mr. Johnson has – first of all, he told three different stories over two months to the police. I don't know anything about it. I did it all myself. I didn't badger did it. That's his two-month swing. And miraculously, at the end of that, wife goes free. So his credibility – he has changed his story quite a lot. The jury believed him, but the jury didn't know all of the benefits that he either anticipated, was promised, why did he anticipate them? Why did he anticipate that the state would allow him to make a resentencing motion over a year later? Way over a year out of time? And in fact, counsel mentions the perjury charge. That was run concurrently. So essentially, in the world of Frank Johnson, who's already doing a seven-year parole disqualifier, a seven-year concurrent sentence is free. Free time. He got nothing extra for that. Let's go a bit over it. And we understand your argument. You've got to be bubbled now. If what's going to follow the arm was directly responsive to something Mr. Bartolomew said, fine. But otherwise, we'll take the matter into advisement. Let me ask this. Because one presentation was made just to get a better handle on this thing. Let me ask for 28J letters. Are you both counsel familiar with what I mean by 28J? Yes, very familiar, Your Honor. As to what it is, I assume there's some regulation in this New Jersey state corrections bill somewhere that was enforced back in 93, 94, whatever you were talking about, as to whether or not there's only one institution in New Jersey at the time that would have housed Frank Johnson with a sentence the length of the sentence he had. I garbled that. Can someone ask me? I just wanted to get some authority, some regulation or something, to help get a better handle on why Johnson was treated the way he was. Very well, Your Honor. I mean, obviously, counsel is in a better position than I, since this may have been a policy, and I'm actually just not sure, and it's more in their area. If it's a policy, it's going to be hard for you to pin down. But I'll certainly make an effort in that. There is just one other thing in terms of this. I think the court asked counsel one question about Pat Badger being released, and there was Pat Badger was locked up twice in the course of this case. She was first locked up on the murder charge. Frank Johnson agrees to cooperate, gives the statement, she gets out. Right when Frank Johnson is about to testify, she gets locked up again, and then once he testifies and Badger's convicted, there's a no-pross file on the second case. She's locked up on this. I assume it's on the record. The second lockup was on the same charge? No, the second lockup was on a different charge. Somebody got stabbed in the hand. She's locked up for a few weeks, and then there's a no-pross, and she walks out right days after Badger is convicted. So just in case, I mean, one might look at this in a way to say, just in case you didn't get the message, Frank, that you better testify the right way, we got Pat in jail again. Put your hand up. It's relevant to my 28-G request. Fine, but I don't want to get into a rebuttal of the rebuttal, but is what you wanted to say relevant to my 28-G request, a concern with that? Yes, I was just going to point out, Your Honor, that this is what I heard by hearsay when I spoke to the prosecutor. That's the best that I can recall back in 1992. Well, it was represented to us as fact. Find out where that came from. Well, that's what his reasoning was. Okay, we'll find out where that came from then. All right. I'd also submit, Your Honor, that that's yet one more factual issue that would make at least a hearing relevant here. Okay, thank you, thank you. Thank you. Thank you, Your Honor.